IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BETTYE L. JACKSON,** <br> **1404 HORIZON COURT** <br> **HERNDON, VIRGINIA 20170** <br><br> **Plaintiff,** <br><br> v. <br><br> **MICHAEL CHERTOFF, SECRETARY,** <br> **U.S. DEPARTMENT OF HOMELAND** <br> **SECURITY/U.S. SECRET SERVICE,** <br> **WASHINGTON, D.C. 20528** <br><br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case Number _____ <br><br> CASE NUMBER 1:05CV01780 <br><br> JUDGE: Rosemary M. Collyer <br><br> DECK TYPE: Employment Discrimination <br><br> DATE STAMP: 09/__/2005 |

RECEIVED U.S. DISTRICT COURT — FILED SEP - 7 2005 — NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT

**SERVE ON:** THE HONORABLE ALBERTO R. GONZALES
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue
Washington, D.C. 20530-0001

and

W. RALPH BASHAM
Director
U.S. Secret Service
C/O Office of Chief Counsel
950 H Street, N.W.
Washington, D.C. 20059

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Bettye L. Jackson ("Plaintiff" or "Ms. Jackson"), pursuant to 42 U.S.C. §§ 2000e-5(f) through (k) and 2000e-16(a), (c) through (e), as amended, and 42 U.S.C. §§ 1981 and 1981a, as amended, and states as follows:

## BASIS FOR SUIT

1. This action is brought pursuant to both Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C. §§ 2000e-5(f) through (k) and 2000e-16(a), (c) through (e), as amended, and 42. U.S.C. §§ 1981, 1981a, as amended, and alleges that Defendant discriminated against Plaintiff on the basis of her race (African American), gender (female), and age (over the age of 40), and by subjecting her to disparate treatment and a hostile working environment on the basis of her race (African American), gender (female), and age (over the age of 40).

## PARTIES

3. Plaintiff is an African American female who, at all times relevant herein, was employed by Defendant. Presently, Plaintiff is employed by Defendant in its Washington, D.C. headquarters, which is located at 950 H Street, N.W.

4. Defendant U.S. Department of Homeland Security/U.S. Secret Service is a federal government agency within the meaning of 42 U.S.C. § 2000e-16.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction and venue pursuant to 28 U.S.C. §§ 1331, and 42 U.S.C. §§ 2000e-5(f)(3) and 2000e-16a – 16c.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. On or about June 8, 2005, Plaintiff received the Final Agency Decision issued by Defendant in Agency Case No.: 03-2389T, EEOC Case No.: 100-2004-00274X.

## FACTS

7. Plaintiff Betty L. Jackson is a 55 year old, African American, female. Presently, and at all relevant times herein, Ms. Jackson was a GS-13, Training Program Analyst.

8. Ms. Jackson began her employment with the U.S. Secret Service in 1991. Her first position was that of a GS-9, Employment Development Specialist.

9. At the outset of her employment with Defendant, Complainant was initially assigned to the Secret Service Training Division, which was located at 1310 L Street, in downtown Washington, D.C.

10. Ms. Jackson was promoted within the position of Employment Development Specialist to the GS-13 classification level. Her last duty station before being transferred back to the U.S. Secret Service's headquarters was the James J. Rowley Training Center (the "Rowley Training Center) in Beltsville, Maryland.

11. While at the Rowley Training Center Ms. Jackson's performance was exemplary.

12. Between approximately June 1998 and August 2000, Special Agent George Kalb worked, out of the Rowley Training Center, with Ms. Jackson as it related to the International Law Enforcement Academy ("ILEA") that was located in Bangkok, Thailand. Kalb had close contact with Ms. Jackson during this time and developed a "high opinion" of both Ms. Jackson and her work.

13. In January 2001, Ms. Jackson received a Mid-Year Evaluation from Wes Budkhe. Therein, Budkhe wrote:

> [B]ettye Jackson has been a vital component to the International Training Program. She continually organizes complex problems concerning coordination of schedules for international classes, conducts foreign training assessments . . . Bettye continually communicates clearly and concisely, both verbally and in written correspondence . .
>
> [J]ackson excels in operational skills . . . Bettye effectively organizes, assembles and arranges resources to meet International goals . . . [She is t]ruly an asset and proven performer in the International Program [Division] and United States Secret Service.

14. Ms. Jackson came over to the newly established International Programs Branch ("IPB") on February 13, 2001. A month later, in March 2001 Peter Paradis, who is a white male also came over to IPB.

15. Between March 2001 and July 2001, the IPB staff was comprised as follows: James Caldwell was the ASAIC (Assistant Special Agent in Charge), Wes Budkhe was the ATASAIC (Assistant to the Assistant Special Agent in Charge), Pete Paradis was a GS-13 Agent, Ms. Jackson was a GS-13 Training Programs Analyst, and Christina De Ramirez was a GS-9 Staff Assistant.

16. For the period March 2001 through June 30, 2001, Caldwell rated Ms. Jackson's performance at an "acceptable" level in all elements. During this time, Caldwell also issued Ms. Jackson a Mid Year Evaluation in January 2002 in which he wrote:

> Bettye is a valued member of the International Programs Branch. She is the primary liaison with the Department of State's Bureau of International Narcotics and Law Enforcement
>
> This relationship has promoted the ability of the Secret Service to obtain sufficient funding to operate the International Training program. She has been instrumental in bringing a better understanding of the program to our personnel stationed overseas.

17. By February 2002, Ms. Jackson's position had been reclassified to that of an International Training Program Analyst, GS-301-13.

18. In May 2002, Pete Paradis was promoted to the position of ATSAIC (Assistant to the Special Agent in Charge). Paradis' promotion was necessitated by the April and May 2002, respective departures of James Caldwell and Wes Budkhe from IPB.

19. It was Caldwell's opinion that prior to Paradis' promotion and Caldwell's departure that Ms. Jackson "was an extremely conscientious and hard worker, way overworked..." who got her work done.

20. During the time that Caldwell supervised Ms. Jackson he has testified that there was no basis for saying that Ms. Jackson was "incompetent" or "seriously delinquent" with respect to her work assignments.

21. During this time, Caldwell has testified that he had to act as a "buffer" between Paradis and Ms. Jackson because of an ongoing conflict. As Caldwell put it: Paradis, and later Matias, had aced Ms. Jackson out of "everything."

22. Likewise, Christina De Ramirez has opined that Ms. Jackson's gender, age, and race were the reasons she was mistreated by Paradis.

23. In July/August 2002, Paradis gave Ms. Jackson her first evaluation as an International Training Program Analyst. For the period July 1, 2001, through June 30, 2002, Paradis rated Ms. Jackson's performance at an "acceptable" level in all elements. At that time, Paradis did not identify any performance deficiencies in the July/August 2002 Performance Appraisal.

24. During the summer of 2002, Michelle Morris, a white female below the age of 40, was pre-selected by Paradis to fill a created International Program Analyst position in IPB.

25. With respect to Morris' pre-selection, three people applied for the position – Yolanda Torres, a Latina who worked in one of the agency's foreign offices and had been employed with the Secret Service for 18 years, Lanetta Scott, a black female who worked in the James J. Rowley Training Center as an Instructor System Development Specialist, had a

Master's degree, and had worked at Johns Hopkins on their career development program, and Morris, a white female who also worked in the James J. Rowley Training Center. No interviews took place.

26. In July 2002, Paradis denied to Dunlap that he had preselected Morris.

27. However, prior to March 2002, Paradis told Caldwell that he wanted to bring Morris over from the Rowley Training Center. Moreover, Morris told Ms. Jackson that Paradis had promised her the position. And Christina De Ramirez overheard a conversation between Paradis and Morris, she believes, during which Paradis told Morris what duties she would be performing when hired.

28. In anticipation of Morris' arrival in IPB, Paradis sent out an e-mail to all of the foreign offices outlining the new structure of the IPB and the duties of all the people who had joined IPB since June 2002. Paradis identified Ms. Jackson's position and duties as "Int'l Law Enforcement Training Program Analyst [ILEAs (International Law Enforcement Academies), and both INL and USS funded project based training initiatives – to included related budget issues". In truth, however, Ms. Jackson duties included: three law enforcement academies, project-based training, curriculum development, cost tracking, class coordination, and budgetary responsibility in each area of responsibility.

29. Paradis further identified Morris' future position and duties as "Int'l Training Program Analyst [All CFT (Counterfeit) Detection Seminars, FPD (Financial Crimes Division) Family Orientation/TNG (Training) Program development, FSN Training Program development. Additionally, ADM conferences and IPB Manual development in conjunction with ADM OPS – all to included related budget issues].

30. Prior to Morris' arrival, Ms. Jackson assisted special agents with the coordination of counterfeit detection seminars.

31. Shortly thereafter, in September 2002, Morris officially was hired/transferred into IPB. Defendant prepared a different position description for Morris, who was hired to fill the position of International Training Program Analyst, GS-301-12/13. Morris' position description specifically states that she is not to have responsibility with respect to International Law Enforcement Training for the Secret Service. However, unlike Ms. Jackson's position description, Morris' position description states that she is to have the opportunity to serve as the "back-up Training Program Analyst in that person's absence." Thus, Ms. Morris was to have the opportunity to back-up Ms. Jackson in her duties, Ms. Jackson's position description did not provide that she would be given an opportunity to back-up Morris in her job duties.

32. Morris and Ms. Jackson shared an office when Morris first arrived in IPB. Upon her return from vacation, Ms. Jackson learned of Morris' hire and that Ms. Jackson's things had been moved to an office that she would share with Morris. When Ms. Jackson moved her things to another desk that had her computer on it, but within the same office, Paradis "chewed" her out in front of John McDonough.

33. Early in her employment within IPB, Morris was dissatisfied with work assignments that she contended were different from that she had been promised. It was De Ramirez's impression that Paradis' job duty promises to Morris could not be honored because Ms. Jackson had filed a grievance.

34. Morris asked Paradis if she could become involved in the ILEA's and assessment trips. Paradis permitted Morris to do so. And in November 2002, Morris also became

-7-

involved in coordinating bilateral training, including writing the proposal, writing the assessment, and preparing the budget, which were all duties that Ms. Jackson had previously performed. With that added duty, Morris went to South Africa and Latin America.

35. Ms. Jackson complained to both Paradis and on several occasions to James Dunlap, the Deputy Assistant Director, about the reassignment of her previous duties to Morris.

36. In October 2002, Jean Matias joined IPB as the SAIC (Special Agent in Charge). Upon her arrival she met with Ms. Jackson, De Ramirez and Morris. It became clear after their initial meeting that Matias questioned the legitimacy of the work, especially travel, that Ms. Jackson had been performing. To that end, Matias refused to permit Ms. Jackson to travel.

37. Prior to Matias' arrival Ms. Jackson traveled as follows: She went to the Dominica Republic in January 2002, to Trinidad in February 2002, in late March and early April 2002, she took a three-leg trip to Bulgaria, Rome, and Budapest, in June 2002 Ms. Jackson returned to Bulgaria, and in July 2002 she went to Taiwan. In October and December 2002, respectively, Matias reluctantly allowed Ms. Jackson to take two overseas trips to Turkey and Seoul, Korea that had been scheduled prior to Matias' arrival in IPB. Thereafter, between December 2002 and May 2004, Ms. Jackson was not permitted to travel.

38. Ms. Jackson later learned that in October/November 2002 Matias contacted individuals with whom Ms. Jackson had worked to find out information about her.

39. Matias also developed a pattern of constantly paging, calling, and e-mailing Ms. Jackson, clearly out of mistrust.

-8-

40. Matias continued to undermine Ms. Jackson. In approximately January 2003, Matias, along with Special Agent Chris Jordan, met with Anthony Gresko, a GS-13 Program Analyst with the State Department Bureau for International Narcotics and Law Enforcement Affairs. Matias made it clear that she, and not Ms. Jackson, would be the primary point of contact with respect to Secret Service/State Department-funded international law enforcement training activities ("INL training programs").

41. Similarly, Fred Kennedy, a GS-14, Program Analyst with the U.S. State Department International Narcotics and Law Enforcement Bureau, recalled that Matias sought him out following an ILEA steering group meeting to advise him that Ms. Jackson would no longer be the Secret Service point of contact.

42. Moreover, Matias continued her efforts to dig up dirt about Ms. Jackson. It was at her January 2003 meeting with Gresko that Matias requested a written accounting of outstanding work products related to Ms. Jackson. However, according to Gresko Ms. Jackson's performance on INL training programs was satisfactory, in fact no better or worse than her counterparts at other agencies.

43. James Caldwell, who was Ms. Jackson's supervisor during the time of the alleged accounting delinquencies, refused to place the blame on Ms. Jackson's shoulders.

44. Further, Kennedy of the U.S. State Department has concurred that Ms. Jackson's performance on State Department programs was satisfactory.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (TITLE VII – HOSTILE WORKING ENVIRONMENT – RACE, GENDER, AND AGE)

45. This cause of action arises under Title VII, as amended, 42 U.S.C. §§ 2000e *et seq.*

46. Plaintiff hereby incorporates by reference paragraphs one (1) through forty-five (45).

47. Plaintiff is African American, female, and over the age of forty (40) and therefore is a member of three (3) distinct protected classifications within the meaning of Title VII, as amended.

48. Plaintiff was qualified to perform the duties of her position on behalf of Defendant.

49. Plaintiff performed the duties of her position in a satisfactory manner.

50. During her employment, Paradis insisted upon calling Plaintiff "sister." Even though Plaintiff sat Paradis down and explain that she was not his sister, and that she found this offensive, Paradis continued calling Plaintiff "sister."

51. Paradis also referred to Ms. Jackson as his "African American baby." Paradis made this statement as it related to the fact that he did not need anymore African American employees since he had Ms. Jackson, his "African American baby," following his termination of an African American stay-in-school student.

52. Paradis' use of the terms "sister" and "African American baby" were part of a pattern of telling ethnic jokes and making ethnic slurs in Ms. Jackson's presence. Paradis

made jokes about the beating of African American arrestee Rodney King by the Los Angeles Police Department.

53. Paradis also referred to Latinos as "wetbacks." Paradis made negative remarks about females in De Ramirez's presence. In fact, Paradis asked De Ramirez to let him know whenever he was not behaving appropriately so that he would not get into trouble generally and later as it related to Plaintiff.

54. Caldwell also recalled Paradis' use of "blue" language (i.e. off humor) and had discussed it with him.

55. Caldwell has confirmed that Ms. Jackson advised him that Paradis had directed discriminatory remarks at her.

56. As a direct and proximate result of the discriminatory conduct of Defendant and their agents and/or employees, Plaintiff has suffered humiliation, mental anguish, and emotional pain, as well as other incidental and consequential damages.

57. Defendant' agents' and/or employees' unlawful and discriminatory motives in their treatment of Plaintiff's employment were willful, wanton, and malicious. As a result, Plaintiff is entitled to full relief under the law, including, but not limited to, economic damages and compensatory.

58. The above stated damages were not the result of any act or omission on the part of Plaintiff.

### SECOND CAUSE OF ACTION
### (TITLE VII – DISPARATE TREATMENT – RACE, GENDER, AND AGE)

59. This cause of action arises under Title VII, as amended, 42 U.S.C. §§ 2000e *et seq.*

-11-

60. Plaintiff hereby incorporates by reference paragraphs one (1) through fifty-nine (59).

61. Plaintiff is African American, female, and over the age of forty (40) and therefore is a member of three (3) distinct protected classifications within the meaning of Title VII, as amended.

62. In April 2001, Complainant began being excluded from meetings, including, but not limited to, meetings between Paradis and Christina De Ramirez. De Ramirez recalled Ms. Jackson being isolated by Paradis.

63. Caldwell also recalled that Paradis, and later Matias, had aced Ms. Jackson out of "everything."

64. Ms. Jackson complained to Caldwell, who is a white male, about Paradis' exclusionary practices. Caldwell told Ms. Jackson to simply accept the fact that Paradis and De Ramirez had become very close, had bonded, and that they liked to work together.

65. Paradis gave Morris favorable work assignments to Ms. Jackson's detriment. Paradis permitted Morris to become involved in the ILEA's and assessment trips. And in November 2002, Morris also became involved in coordinating bilateral training, including writing the proposal, writing the assessment, and preparing the budget, which were all duties that Ms. Jackson had previously performed. With that added duty, Morris went to South Africa and Latin America.

66. Defendants permitted Morris to infringe upon, and ultimately take over, areas of Plaintiff's job duties, including as it related to State Department INL training programs responsibilities.

-12-

67. On more than one occasion, Paradis told De Ramirez that he was going to change Ms. Jackson's job duties in an effort to force her out.

68. Matias refused to permit Ms. Jackson to travel between December 2002 and May 2004.

69. For pretextual reasons, Defendants also issued to plaintiff job duty criteria and performance memoranda.

70. Matias also gave Morris special parking privileges.

71. As a direct and proximate result of the discriminatory conduct of Defendant and their agents and/or employees, Plaintiff has lost has suffered humiliation, mental anguish, and emotional pain, as well as other incidental and consequential damages.

72. Defendant' agents' and/or employees' unlawful and discriminatory motives in their treatment of Plaintiff's employment were willful, wanton, and malicious. As a result, Plaintiff is entitled to full relief under the law, including, but not limited to, economic and compensatory damages.

73. The above stated damages were not the result of any act or omission on the part of Plaintiff.

### THIRD CAUSE OF ACTION
### (42 U.S.C. § 1981 – RACE-BASED DISCRIMINATION AND HOSTILE WORK ENVIRONMENT)

74. This cause of action arises under 42 U.S.C. § 1981.

75. Plaintiff hereby incorporates by reference paragraphs one (1) through seventy-four (74).

76. Plaintiff is African American is therefore covered within the meaning of 42 U.S.C. § 1981.

77. Plaintiff was qualified to perform the duties of her position on behalf of Defendant.

78. Plaintiff performed the duties of her position in a satisfactory manner.

79. During her employment, Paradis insisted upon calling Plaintiff "sister." Even though Plaintiff sat Paradis down and explain that she was not his sister, and that she found this offensive, Paradis continued calling Plaintiff "sister."

80. Paradis also referred to Ms. Jackson as his "African American baby." Paradis made this statement as it related to the fact that he did not need anymore African American employees since he had Ms. Jackson, his "African American baby," following his termination of an African American stay-in-school student.

81. Paradis' use of the terms "sister" and "African American baby" were part of a pattern of telling ethnic jokes and making ethnic slurs in Ms. Jackson's presence. Paradis made jokes about the beating of African American arrestee Rodney King by the Los Angeles Police Department.

82. Paradis also referred to Latinos as "wetbacks." Paradis made negative remarks about females in De Ramirez's presence. In fact, Paradis asked De Ramirez to let him know whenever he was not behaving appropriately so that he would not get into trouble generally and later as it related to Plaintiff.

83. Caldwell also recalled Paradis' use of "blue" language (i.e. off humor) and had discussed it with him.

84. Caldwell has confirmed that Ms. Jackson advised him that Paradis had directed discriminatory remarks at her.

85. As a direct and proximate result of the discriminatory conduct of Defendant and their agents and/or employees, Plaintiff has suffered humiliation, mental anguish, and emotional pain, as well as other incidental and consequential damages.

86. Defendant' agents' and/or employees' unlawful and discriminatory motives in their treatment of Plaintiff's employment were willful, wanton, and malicious. As a result, Plaintiff is entitled to full relief under the law, including, but not limited to, economic and compensatory damages.

87. The above stated damages were not the result of any act or omission on the part of Plaintiff.

### PRAYER FOR RELIEF

88. WHEREFORE, Plaintiff requests the following relief:

    a. a finding that Defendant violated the Title VII, as amended, and 42 U.S.C. § 1981;

    b. compensatory damages in the amount of five million dollars ($5,000,000.00), or a greater amount deemed appropriate by a jury, if permitted pursuant to Title VII, as amended, and 42 U.S.C. § 1981;

    c. sanitization and/or expungement of Plaintiff's personnel file, and any other performance-related files;

    d. attorney's fees and costs relating to the administrative and judicial prosecution of Plaintiff's complaints; and

    e. Any other relief deemed appropriate.

### JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

THE LAW OFFICES OF ADRIAN V. NELSON, II

By: _____
Adrian V. Nelson, II, Esq., *Pro Hac Vice*
The Adams Law Center
31 Wood Lane
Rockville, Maryland 20850
301-424-6601
301-424-6770 Fax

Dated: September 6, 2005


GEBHARDT & ASSOCIATES, LLP


By: _____
Joseph D. Gebhardt, Esq., D.C. Bar No. 113894
1101 17th Street, N.W.
Suite 607
Washington, D.C. 20036
202-496-0400
202-496-0404 Fax

Dated: September 6, 2005

-16-

## VERIFICATION

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the above Plaintiff's Original Complaint are true and I am competent to testify to these matters. The Defendant is not now in the military service, as defined in the Soldier's and Sailor's Civil Relief Act of 1940 with amendments, nor has been in such service within thirty days hereof.

_Bettye L. Jackson_            _9/6/05_
Bettye L. Jackson, Affiant            Date